# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE: BROILER CHICKEN GROWER LITIGATION | |
| | CASE NO. |
| | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| HAFF POULTRY, INC.; NANCY BUTLER; JOHNNY UPCHURCH; JONATHAN WALTERS; MYLES B. WEAVER; MELISSA WEAVER; and all others similarly situated, | |
|      Plaintiffs, | |
| v. | |
| KOCH FOODS, INC.; KOCH MEAT CO, INC., d/b/a KOCH POULTRY CO.; SANDERSON FARMS, INC.; SANDERSON FARMS, INC. (FOOD DIVISION); SANDERSON FARMS, INC. (PROCESSING DIVISION); and, SANDERSON FARMS, INC. (PRODUCTION DIVISION), | |
|                Defendants. | |

Plaintiffs HAFF POULTRY INC., NANCY BUTLER, JOHNNY UPCHURCH, JONATHAN WALTERS, MYLES B. WEAVER and MELISSA WEAVER (collectively, "Plaintiffs"), on behalf of themselves and all other similarly situated broiler chicken growers, bring this antitrust and unfair competition action seeking treble damages under Section 1 of the Sherman Antitrust Act and Section 202 of the Packers and Stockyards Act, demanding a trial by jury of all issues so triable. Plaintiffs allege the following, based upon personal knowledge as to matters relating to themselves, and upon information and belief and the investigation of counsel as to all other matters:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of a proposed class of broiler chicken ("Broiler") growers, also known as poultry growers (referred to herein as "Growers"), against vertically-integrated poultry company defendants ("live poultry dealers" or "Integrators"), which operate Broiler processing plants ("Complexes"), concerning the Integrators' anticompetitive, collusive, predatory, unfair, and bad faith conduct in the domestic market for Broiler growing services (also referred to herein as "Broiler Grow-Out Services"). This case involves agreements by Defendants (defined *infra*) and their Co-Conspirators (defined more fully, *infra*, and together with Defendants, the "Cartel")—dating back to at least 2008—not to compete for Broiler Grow-Out Services, with the purpose and effect of fixing, maintaining, and/or stabilizing Grower compensation below competitive levels.

2.      As part of the scheme, the Cartel members illegally agreed to share detailed data on Grower compensation with one another, with the purpose and effect of artificially depressing Grower compensation below competitive levels. By disclosing their highly sensitive and confidential compensation rates to each other, they suppressed competition for Broiler Grow-Out

Services and drove down compensation to all Growers. By sharing this information on a frequent and contemporaneous basis, the Cartel has been able to keep Grower compensation lower than it would have been in a competitive market, and to keep the increased profits for themselves. This illegal information exchange, combined with other anticompetitive conduct alleged herein, drove down Grower compensation nationwide. The members of the Cartel recognized the benefits of sharing this highly sensitive, proprietary and otherwise confidential Grower compensation information with each other, but not with the Growers themselves.

3.    In furtherance of their agreement not to compete for Broiler Grow-Out Services, Cartel members also agreed not to solicit Growers associated with other Integrators. By agreeing not to compete for the services of one another's Growers, the Cartel members attempted to insulate themselves from normal competitive pressures that could potentially erode the effects of their information sharing agreement. This illegal "no poach" agreement inoculated the Cartel against potential cheating by its members on the Cartel's compensation suppression scheme and furthered its efforts to artificially suppress Grower compensation below competitive levels.

4.    These agreements (together, the "Scheme") were designed to keep Growers, as author Christopher Leonard noted in *The Meat Racket: The Secret Takeover of America's Food Business*, "in a state of indebted servitude, living like modern-day sharecroppers on the ragged edge of bankruptcy."

## PARTIES

5.    Plaintiff Haff Poultry, Inc. is owned by Steve Haff, his wife, and his father-in-law. Haff Poultry, Inc. (collectively "Haff") began providing Broiler Grow-Out Services for Hudson, a major poultry producer, in Oklahoma in 1996. Haff borrowed $365,000 to build four Broiler houses to Hudson's specifications. When Co-Conspirator Tyson (defined *infra*) purchased

3

Hudson, Haff became a grower for Tyson. During the course of Haff's time providing Broiler Grow-Out Services for Tyson, Tyson demanded that Haff make further investments in its Broiler houses. Haff borrowed or spent another $250,000 making these improvements to its Broiler houses because Tyson threatened not to deliver Broilers for Haff to care for unless Haff did so. Haff would not have been able to make ends meet with Tyson's compensation alone, and so ran a separate and profitable cattle-raising operation at the same time. In October 2015, Haff quit providing Broiler Grow-Out Services. Haff was left with four Broiler houses that have no value other than caring for Broilers, and $130,000 in lingering debt.

6.     Plaintiff Nancy Butler (d/b/a Butler Poultry) began providing Broiler Grow-Out Services for Co-Conspirator Perdue (defined *infra*) in Kentucky in 1996. Ms. Butler borrowed $250,000 to build two Broiler houses to Perdue's specifications. During the course of her time providing Broiler Grow-Out Services, Perdue required that Ms. Butler make further investments to her Broiler houses. Ms. Butler borrowed or spent at least another $50,000 making these improvements to her Broiler houses. Throughout her time providing Broiler Grow-Out Services, she was barely able to make ends meet with the compensation provided by Perdue. She recently took out another loan for required equipment.

7.     Plaintiff Johnny Upchurch began providing Broiler Grow-Out Services for Spring Valley around 1980 in Alabama, and then began providing Broiler Grow-Out Services for Tyson in approximately 1990. In 2000, Defendant Koch (defined *infra*) bought the Tyson Complex for which Mr. Upchurch provided Broiler Grow-Out Services, at which point Mr. Upchurch began providing Broiler Grow-Out Services for Koch. Mr. Upchurch spent well over $100,000 on six Broiler houses. Throughout his time providing Broiler Grow-Out Services, he was barely able to make ends meet with the compensation provided by Tyson or Koch. In December 2014, after 24

4

years with Tyson and Koch, Mr. Upchurch was finally financially able to quit providing Broiler

Grow-Out Services without lingering debt and did so. Mr. Upchurch was left with four Broiler

houses that have no value outside of caring for Broilers.

8.     Plaintiff Jonathan Walters began providing Broiler Grow-Out Services for

Defendant Sanderson (defined *infra*) in Mississippi in approximately 2001. Mr. Walters

borrowed $639,000 to build four Broiler houses to Sanderson's specifications. Over his time

providing Broiler Grow-Out Services, Sanderson demanded that Mr. Walters make further

investments into his Broiler houses. Mr. Walters borrowed or spent another $100,000 making

these improvements to his Broiler houses because Sanderson threatened not to deliver Broilers

for Mr. Walters to care for unless he did so. Mr. Walters would not have been able to make ends

meet with Sanderson's compensation, and so worked several other part-time jobs while caring

for Broilers. In December 2015, Mr. Walters quit providing Broiler Grow-Out Services. Mr.

Walters was left with four Broiler houses that have no value outside of caring for Broilers and

$130,000 in debt. Mr. Walters had to mortgage his residence—which he owned outright before

he began caring for Broilers—to secure that debt.

9.     Plaintiffs Myles B. Weaver and Melissa Weaver (the "Weavers") own Weaver

Farms. The Weavers purchased Weaver Farms with two (2) poultry houses located in Pendleton

County, West Virginia in 2001 for $780,000. The poultry houses on the farm were originally

built to raise turkeys. They raised turkeys on this farm for Co-Conspirator Pilgrim's (defined

*infra*) for the first three years. At a cost of $200,000, the Weavers converted the houses to grow

Broilers for Pilgrim's in 2004 and continued to care for Broilers for Pilgrim's. The Weavers'

revenue from the broiler growing operation has declined meaningfully over time.

10.     Defendant Koch Foods, Inc. is a Delaware corporation headquartered in Park

Ridge, Illinois that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Koch Foods, Inc. is the fourth largest Integrator in the country, operating eight Complexes located throughout the United States and processing 12 million Broilers weekly, and accounting for more than 7% of the Broilers sold in the United States.

11.    Defendant Koch Meat Co., Inc., d/b/a Koch Poultry Co., is an Illinois corporation headquartered in Park Ridge, Illinois (and is a wholly-owned subsidiary of Koch Foods, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Defendants Koch Foods, Inc., and Koch Meat, Co., Inc. are collectively referred to herein as "Koch."

12.    Defendant Sanderson Farms, Inc. is a Mississippi corporation headquartered in Laurel, Mississippi that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Sanderson Farms, Inc. is the fifth largest Integrator in the country, operating nine Complexes located throughout the United States and processing 8.62 million Broilers weekly, and accounting for 5.3% of the total Broiler sales in the United States.

13.    Defendant Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation headquartered in Laurel, Mississippi (and a wholly-owned subsidiary of Sanderson Farms, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

14.     Defendant Sanderson Farms, Inc. (Production Division) is a Mississippi corporation headquartered in Laurel, Mississippi (and a wholly-owned subsidiary of Sanderson Farms, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

15.     Defendant Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation headquartered in Laurel, Mississippi (and a wholly-owned subsidiary of Sanderson Farms, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

16.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson Farms, Inc. (Processing Division), are collectively referred to herein as "Sanderson."

17.     Defendants Koch and Sanderson are collectively referred to herein as "Defendants."

## AGENTS AND CO-CONSPIRATORS

18.     Agri Stats, Inc. ("Agri Stats") is an Indiana Corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana. Agri Stats, which purports to be a third-party data aggregation service, served as a conduit by which the Cartel shared, *inter alia*, detailed, competitively sensitive, non-public information about Grower compensation.

19.     Tyson Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas that collusively shares nonpublic information through Agri Stats and otherwise

engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Tyson Foods, Inc. is the largest Integrator in the country, operating thirty-three Complexes located throughout the United States, and processing some 35.4 million Broilers weekly. Tyson Foods, Inc. accounts for nearly 22% of the total number of Broilers processed in the United States.

20.    Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas (and a wholly-owned subsidiary of Tyson Foods, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

21.    Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas (and a wholly-owned subsidiary of Tyson Foods, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

22.    Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas (and a wholly-owned subsidiary of Tyson Foods, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

23.    Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc., are collectively referred to herein as "Tyson."

24.    Pilgrim's Pride Corporation is a Delaware corporation headquartered in Greeley, Colorado ("Pilgrim's") that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. JBS USA Holdings, Inc. holds a 75.3% controlling

8

interest in Pilgrim's. JBS USA Holdings, Inc. and Pilgrim's are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil. Pilgrim's is the second largest Integrator in the country, operating twenty-six Complexes located throughout the United States and processing 33.1 million Broilers weekly, and accounting for more than 20% of the Broilers sold in the United States.

25.     Perdue Farms, Inc. is a Maryland corporation headquartered in Salisbury, Maryland that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Perdue Farms, Inc. is the third largest Integrator in the country, operating twelve Complexes located throughout the United States and processing 12.01 million Broilers weekly, and accounting for more than 7% of the Broilers sold in the United States.

26.     Perdue Foods LLC is a Maryland corporation headquartered in Salisbury, Maryland (and a wholly-owned subsidiary of Perdue Farms, Inc.) that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

27.     Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to herein as "Perdue."

28.     Foster Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

29.     Mountaire Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect

of suppressing Grower compensation below competitive levels.

30.    Wayne Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

31.    George's, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

32.    Peco Foods, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

33.    House of Raeford Farms is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

34.    Simmons Foods is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

35.    Keystone Foods, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

36.    Fieldale Farms Corp. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

37.    O.K. Industries is an Integrator that collusively shares nonpublic information

10

through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

38.    Case Foods is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

39.    Marshall Durbin Companies is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

40.    Amick Farms, Inc. is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

41.    Claxton Poultry Farms (collectively with the non-parties identified in Paragraphs 18 through 40, *supra*, "Non-Defendant Co-Conspirators" or "Co-Conspirators"), is an Integrator that collusively shares nonpublic information through Agri Stats and otherwise engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels.

## JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under the Packers and Stockyards Act of 1921, 7 U.S.C. § 192, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections Four and Sixteen of the Clayton Act Antitrust Act of 1914, 15 U.S.C. §§ 15 and 26.

43.    This Court has personal jurisdiction over each of the Defendants under Section Twelve of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and/or

the long-arm statute of the forum state.

44.     Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state, including the domestic sale of Broilers.

45.     Defendants, directly or through their agents, engage in interstate commerce in the production, processing, and distribution of Broilers for sale in the United States.

46.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because both Defendants maintain business facilities, have agents, transact business, and/or are otherwise found within this District, and certain of the unlawful acts alleged herein were performed and had effects within this District.

## FACTUAL BACKGROUND

### The Broiler Grow-Out Services Industry

47.     Broilers—young chickens bred for meat—account for nearly all domestic chicken consumption.[1] Broiler production is concentrated into localized networks of production dominated by vertically integrated poultry companies ("Integrators"). Integrators (such as Defendants herein) control virtually every aspect of Broiler production, although they do not care for the birds themselves. Instead, they enter into so-called contract farming arrangements ("CFAs"), also known as "poultry growing arrangements," with thousands of Growers, which are predominately small, family-owned farm operations that provide the Integrators with Broiler Grow-Out Services until the birds reach slaughtering age. Broiler Growers operating under CFAs care for over 97% of domestic Broilers produced annually in the United States. For decades, there has not been a spot or cash market for Broilers, largely because Defendants and their Co-

---

[1] The term "Broilers" as used here excludes specialty chicken that is grown, processed, and sold according to, for example, halal, kosher, free range, pasture-raised, or organic standards.

Conspirators, through their vertically integrated operations, control all aspects of Broiler

production and do not obtain Broilers other than through CFAs.

48.     Tyson, Pilgrim's, Perdue, Koch, and Sanderson are by far the five largest

Integrators operating in the United States, collectively contracting for over 60% of the Broiler

Grow-Out Services performed in the United States.

49.     Commercial poultry production began in the United States in the 1930s with the

development of the Broiler—a chicken specifically bred for meat (prior to that, poultry was

generally a byproduct of egg production). At that time, hatcheries, feed mills, farms, and

processors were generally all non-affiliated separate entities.

50.     Hatcheries (where Breeder eggs are hatched to be raised as Broilers) have

vertically coordinated activities between the feed mill operators, Growers, and processors. Feed

mill operators began to extend credit to Growers to buy baby chicks and the necessary feed.

When the flock became market-ready, the Grower would sell the chicken to the processor and

pay off the debt it owed to the feed mill operator.

51.     In the middle of the century, a dramatic shift took place in the way that poultry

was raised for consumption. By the 1960s, some ninety percent of Broilers came from vertically

integrated operations that owned or otherwise controlled the hatcheries, feed mills, farms, and

processors.

52.     The result of this market shift was the creation of the modern Broiler industry, the

most vertically integrated segment of agriculture today. There are only approximately 25

Integrators in the nation. They supply their vertically integrated production complexes

("Complexes") with Broilers cared for pursuant to agreements with approximately thirty-

thousand poultry growers. Complexes typically include one or more hatcheries, feed mills,

slaughter plants, and further processing plants that are owned and operated by the Integrator.

53.    Defendants and their Co-Conspirators have devised a system of "factory farming" that effectively transfers the risk of Broiler production from them on to Growers.

54.    While not caring for the birds themselves, Integrators (such as Defendants) control virtually every aspect of the Broiler Grow-Out process including: the genetics of the Broilers; the amount, type and timing of the Broilers delivered to a Grower to care for; the composition, amount, and delivery schedule of feed; the distribution of medical services and medication; the structure, temperature, ventilation, lighting duration, and other environmental aspects of the Broiler houses; the decision of whether to cull or condemn Broilers; the length of time that Growers are permitted to care for the Broilers; the time, method, and manner that Broilers will be picked up for processing; the time between when Broilers are picked up and when they are weighed; and the disposal method of birds and their excrement by the Growers.

55.    Growers use land they have purchased and developed for the purpose of caring for Broilers to take-in Broilers owned by the Integrators, and care for those Broilers until the Integrators decide to take them back, bearing all of the physical, environmental and health impacts from caring for the birds, even though the Growers never own the animals.[2]

56.    Integrators provide birds, feed, veterinary services, and mandated supervision to their Growers; the Growers provide labor, utilities, and substantial up-front investment capital required to care for the Broilers to slaughtering age, *i.e.*, Broiler Grow-Out Services. The Growers are responsible for investing the capital needed to build and maintain Broiler houses,

---

[2] The Packers & Stockyards Act defines "poultry growers" as persons engaged in the business of raising and caring for live poultry for slaughter by another, regardless whether the poultry is owned by such person or by another but not an employee of the owner of such poultry. *See* 7 U.S.C. § 183(a)(8).

maintain ownership of the land upon which the Broiler houses are located, provide the

equipment, care for the Broilers (pursuant to Integrators' exclusive specifications), and pay for

all labor needed to successfully care for the Broilers until they reach slaughtering age (which is

determined by the Integrator in its sole discretion).

57.     The Integrators determine the precise specifications for Grower's grow-out

houses and other equipment. Integrators typically provide little to no capital for the grow-out

facilities, although such facilities must be built to Integrators' precise, onerous, and sometimes

arbitrary specifications. Growers are prohibited from using any inputs (*e.g.*, birds, feed, or

medicine) other than those provided by their Integrator, from raising or caring for Broilers

provided by any competing Integrator, or from raising or caring for other poultry or ratites of

their own or obtained from any other source.

58.     Growers must also maintain roads to their facilities, provide utilities and other

fixed costs (including purchasing land and building grow-out facilities), and dispose of dead

birds (even if the Integrator delivers dead Broilers). Integrators have an unlimited right to enter

Growers' facilities to inspect birds, and can seize Growers' facilities—taking control until such

time as the birds are ready for processing—if the Integrator determines in its sole discretion that

the Grower is not performing adequately.

59.     CFAs are substantially similar across Integrators, with nearly identical terms

governing Integrator control and Grower compensation.

60.     Defendants and their Co-Conspirators require Growers to be exclusive to one

Integrator. The Cartel members do not permit Growers to provide Broiler Grow-Out Services for

any other Integrator, even if their Integrator delays delivery of chicks or fails to deliver chicks at

all and even if they could keep separate grow-out facilities on their farms or another separate

farm owned by the Grower for each specific Integrator.

61.    Growers often go into substantial debt to begin providing Grow-Out Services. A single grow-out house can cost $300,000 or more. According to one study, while the average Grower surveyed had been in the Broiler business for 16 years, one-third still had more than $200,000 in total farm debt.

62.    Integrators have the most power over Growers when Growers are laden with debt from building or upgrading the grow-out facilities. Thus, Integrators are keenly aware of Growers' debt burdens, and require them to undertake unnecessary and expensive upgrades to their facilities to prevent their financial independence—with the intent of keeping Growers debt-laden.

63.    Even a relatively well-performing Grower will often spend fifteen to twenty-five years recouping his or her investment or paying down its debt, and for those less fortunate, the possibility of economic independence is simply a fiction.

64.    One prominent commentator observes that "[o]nce one enters the life of a grower, the trap is closed: high capital costs and large debt to enter the business, no input on product prices, no market in which to sell the goods and no way out except bankruptcy[.]"

65.    Due to the control Integrators have over the grow-out process under their CFAs, Integrators are also the sole keepers of information that Growers need to estimate their expected profits. Although Integrators have information concerning Grower compensation, expected returns, and likely costs, Integrators intentionally do not provide such critical information to Growers. The information Integrators do provide to Growers is either misrepresented or omits material information—usually both.

66.    While the Cartel shares detailed confidential information amongst its members

regarding Grower compensation (including information sufficient to allow Integrators to determine Cartel members' compensation to individual Growers), typically Growers are subject to strict confidentiality requirements and strictly prohibited from sharing information on compensation with other Growers under their CFAs. These agreements have at times prevented some Growers from even sharing the terms of their agreements with lenders or other third-parties involved with financing.

67.     In 2015, the domestic Broiler industry produced almost 9 billion Broilers, weighing 53 billion pounds "liveweight." That same year, Americans spent $90 billion buying chicken—making it the number one protein consumed in the United States.

### Defendants' Anticompetitive Scheme:

### (1) Unlawful Information Exchange Cartel

68.     Since at least 2008, and likely earlier, as part of their Scheme to artificially suppress Grower compensation, Defendants and their Co-Conspirators have agreed to and have shared with themselves (but not with Growers) detailed Grower compensation information.

69.     This conspiracy has been effectuated in large part through the collusive dissemination of critical and sensitive business data through Agri Stats. Agri Stats is a "statistical research and analysis firm." It is a self-described "management reporting and benchmarking company," that "provides consultation on data analysis, action plan development and management practices of participating companies." Its mission is "[t]o improve the bottom line profitability of [its] participants by providing accurate and timely comparative data . . . ."

70.     Defendants' and their Co-Conspirators' exchange of information on Grower compensation is anticompetitive, and has resulted in lower compensation for all Growers than each would have received in a competitive market.

71.     Agri Stats "partners" with Integrators. All Cartel members, including, *e.g.*, both Defendants, disseminate the granular information described below through Agri Stats as part of the Scheme alleged herein. Cartel members comprise some 120 Complexes, amounting to about 98% of Broiler production in the United States. Only Broiler producers that supply data to Agri Stats are permitted to receive the Agri Stats reports.

72.     The data that Defendants and their Co-Conspirators share through Agri Stats includes production information on individual Complexes, broken down by region as well as viewable at the "farm [*i.e.*, Grower], flock [*i.e.*, transaction], or plant [*i.e.*, Complex] level;" in other words, the information is not aggregated, but disaggregated down to the transaction level.

73.     Cartel members provide granular data to Agri Stats. The data includes, *inter alia*:

a.  Grower compensation;

b.  the sex, breed, genetic makeup, and genetics company used for the primary breeder stock of the Broilers used by each Complex's Integrator;

c.  the type of equipment and grow-out houses used by each Complex's Integrator, including numerous mechanical aspects of the facilities;

d.  Broiler weight for each Complex;

e.  the type of feed and medicine utilized by (and costs for) each Complex;

f.  Broiler transportation costs from Grow-Out facilities to each Complex;

g.  the number of chicks delivered, bird mortality by week and overall percentage, average daily weight gain by chicks (weighted against the feed utilized, referred to as a feed-conversion ratio) for each Complex;

h.  live pound of Broiler produced per square foot of grow-out house for each Complex;

      i.   monthly operating profit per live pound, sales per live pound, and costs per live pound for each Complex;

      j.   anticipated capacity and future output for each Complex; and

      k.   the general geographic location of each Complex by Sub-Region (Agri Stats includes at least 50 and likely more Sub-Region identifier codes).

74.     The shared data can also be viewed by geographic region as opposed to by Complex.

75.     The shared data is provided to, and disseminated by, Agri Stats on a weekly basis.

76.     The shared data lacks adequate safeguards to prevent or limit access to competitors' competitively sensitive information. While the data is purportedly anonymous, it is so granular and disaggregated that anyone familiar with the industry can use Agri Stats to identify precisely which data belongs to which Integrator and even the location of the specific Complex. In particular, the Sub-Region identifier code, the type and genetic makeup of the Broiler, and the type of poultry house and equipment, can readily be used to determine the Integrator that owns a given Complex and the specific identity of the Complex. It is common knowledge among producers that this is possible.

77.     The result is that Cartel members can identify, by Complex, various Grower compensation data, such as cost per liveweight pound, cost per square foot, and other "Actual Live Production Cost" data, including base compensation for Growers. As a result, every Cartel member knows the base Grower compensation paid by every other Cartel member for each Complex. The Cartel members are therefore able to constantly monitor each other's compensation levels to Growers and ensure that no Integrator is offering materially more in compensation than another.

78.     Agri Stats facilitates this non-public information exchange between the members of the Cartel. Even if a Cartel member is unable to individually identify a so-called competitor's data from the Agri Stats report, Agri Stats' employees are able to confirm for Cartel members the data for a particular company at quarterly meetings with each company or at the numerous trade association meetings where Agri Stats executives present on a regular basis. Agri Stats would meet with each Defendants' and their Co-Conspirators' executives and make a detailed presentation about company and industry data. At such meetings, Agri Stats would often be asked to confirm the identity of a particular competitor in an Agri Stats report. Further, since Agri Stats met with individual Cartel members regularly and discussed each member's non-public, proprietary data, Agri Stats was in a unique position to share information among the Cartel members.

79.     Neither the Integrators nor Agri Stats will share the information with Growers. And because there are no open market transactions, there are no reported, public prices for live Broilers. A recent GAO report concludes, "[w]e did not identify reliable information on prices poultry farmers received." Consequently, Broiler industry experts C. Robert Taylor, PhD, and David A. Domina identified "the sharing of price and other market information by so-called competitors" through Agri Stats as a "well known" and "significant" antitrust issue.

80.     Further, the Cartel members engage in a program of "feedmill cross-testing" in which some Defendants and their Co-Conspirators exchange feed and chicks with one another for the purported purpose of determining which Co-Conspirators' feed and/or chicks have superior qualities. Defendants claim, as a pretext, this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for an Integrator to provide its proprietary feed and/or chicks to its would-be competitors, thereby giving away any

competitive cost advantage.

81.     Moreover, Defendants and their Co-Conspirators routinely permit would-be competitors' CEOs access to each other's production Complexes. In a competitive industry, production methods should be closely guarded to protect proprietary methods of production that save a company money and give it a competitive advantage. However, this is not the case in the Broiler industry. For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson growhouse and processing plant. Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue's operations and panel discussions with Defendants' and their Co-Conspirators' senior executives.

82.     The Cartel members also permit high level employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's. Similarly, Clint Rivers, former President and CEO of Pilgrim's until December 2008, left the company and became Perdue's Senior VP of Operations and Supply Chain Management in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Numerous other high level and well as lower level executives move freely between Broiler companies with little or no provisions to protect confidential information.

### (2) Defendants' "No Poach" Agreement

83.    Since at least 2008, and likely earlier, as part of their Scheme to artificially suppress Grower compensation, the Cartel members have agreed not to solicit or recruit Growers from one another, and in many instances, have agreed not to hire Growers from each other.

84.    For example, in a letter to the Grain Inspection, Packers and Stockyards Administration ("GIPSA"), one Tyson Grower described how he was informed about this agreement:

> [Co-conspirator Peco Foods] ran an ad in the paper about five months ago, and I called because I knew business was good. I talked to a secretary and ***she told me that the companies had an agreement among each other to not take each other's growers***.

85.    One article noted another Grower's difficulty in switching Integrators:

> [The Broiler farmer] noted that there were three other poultry processors in her area, but in the murky world of agribusiness, none of the other integrators would offer her a contract as a grower. ***For those not familiar with the poultry industry, there is an unwritten pact between poultry companies that each of them abide by: we won't poach your growers if you don't poach ours. For a farmer who falls out with one integrator in their area, it spells financial doom as no other company will pick up their contract to grow birds if they leave their current integrator.*** This type of collusion has not only limited opportunities and markets for farmers, but also put them in a position where there is no other option than to comply with the corporation's "take it or leave it" contracts and constantly shifting demands.

86.    In a workshop entitled Exploring Competition in Agriculture before the Department of Justice, another Grower confirmed the Cartel members' agreement not solicit each other's Growers:

> When I started growing chickens in 1995 I bought land and moved 60 miles from where I grew up. I moved to the broiler capitol of my state. I did this thinking that . . . if I had a reason to switch from one integrator to another I could. ***After a few months into the business I realized that the integrators have an unwritten pact with their sister integrators, "You don't take our growers and we won't take yours."***

87.    Another Grower testified: "In our area we have more than one company, but it seems to be a written [sic] rule that if you go grow for one company, you really don't have the

opportunity to even cross those lines to go to another company."

88.     Similarly, another Grower stated: "But as everyone else has said, in our community there are several companies, *but once you start with one, that's the only one that will allow you a contract. They won't cross the lines to come to your farm*."

89.     As a result of the Cartel's "no poach" agreement, Growers very rarely switch Integrators. Studies show that few Growers have ever been able to successfully switch Integrators, and of those, almost none were able to obtain better contract terms in the switch. A study from 1999 reported that of the Growers who changed companies, 47% of those did so because "the old company closed or changed hands," while 12% reported that they were "cut off by their old company." Only a tiny percentage of Growers who switched did so of their own accord.

90.     Only 2.88% of Growers switched in 2014 to go to another Integrator.

91.     A recent study sponsored by the Defendants' own trade association (the National Chicken Council) indicated that in 2014, fewer than 5% of Growers were able to switch Integrators.

92.     In those rare instances where Growers are able to switch Integrators, it is usually accompanied by a benefit to the Integrator the Grower is leaving. For example, Tyson may have excess processing capacity and Pilgrim's may have too many Growers under contract; in this scenario, the would-be horizontal competitors would allow Growers to switch from Pilgrim's to Tyson, although without conferring any meaningful benefits to the Growers as a result of the switch.

93.     One 2012 study by economists with the U.S. Department of Agriculture found that over three-quarters of Growers have more than one Integrator in their geographic area. Thus

the vast majority of Growers could, in theory, switch Integrators (even without moving geographically) in the absence of the conduct challenged in this case.

### Factors Rendering the Broiler Industry Conducive to Effective Collusion

94.    The Broiler industry is characterized by numerous features, or plus factors, that render the industry susceptible to collusion and bolster the plausibility of the Scheme alleged herein. These include: (1) high entry barriers for Integrators; (2) high exit barriers for Growers; (3) inelastic consumer demand for and a lack of substitutes for Broilers as well as Broiler Grow-Out Services; (4) industry concentration; (5) fungibility of Broiler Grow-Out Services; and (6) numerous opportunities to collude.

95.    The poultry industry is vertically integrated, where Integrators control both the products, *i.e.*, the chickens, and the means by which to bring those products to market, *i.e.*, the feed mills, veterinary care, trucking operations, slaughterhouses, processing facilities, and sales contracts. As a result, it is exceptionally expensive and logistically complex for new Integrators to emerge and compete with existing Integrators.

96.    The Broiler industry is characterized by high entry barriers for Integrators. These include the high fixed costs of establishing a Broiler Complex and a distribution network capable of delivering Broilers to grocery chains or wholesalers for delivery to commercial eateries and end consumers, and the high regulatory costs of ensuring compliance with onerous FDA mandates and regulations.

97.    The Broiler industry is characterized by high exit barriers for Growers. To enter the market, Growers must make substantial financial investments tied to Broiler-specific equipment and facilities, which offer no use outside of caring for Broilers. This means that even faced with sub-competitive pay, Growers tend not to exit the Broiler Grow-Out Services market,

because of the risk or inevitability of financial ruin from an inability to service that debt. Thus, once Growers enter the Broiler Grow-Out Services business, they become a captive audience, with little ability to avoid or circumvent the anticompetitive practices challenged herein.

98.    In 1999, Growers had an average of 3.6 grow-out houses. While the average Grower surveyed had been in the Broiler business for 16 years, one-third still had more than $200,000 in total farm debt. In 2009 following Pilgrim's bankruptcy, Growers terminated as a result had up to $600,000 in lingering debt.

99.    Moreover, Integrators monitor Growers' debt burdens, requiring Growers to undertake unnecessary and expensive upgrades if Growers ever do near financial independence. For example, in 2004, 49% of Growers were mandated to make improvements costing an average of $49,037.

100.    Pursuant to Integrators' investment requirements, Growers shoulder over fifty percent of the total investment costs across the entire Broiler industry.

101.    These large financial investments into Broiler-specific equipment and facilities mean that Growers can generally only service this debt by continuing to care for Broilers. As a result, Growers are insensitive to (*i.e.*, unlikely to exit the market because of) changes in compensation.

102.    Demand for Broiler Grow-Out Services is relatively inelastic. Broilers are a staple food product and other meat products such as beef or pork are not generally considered to be reasonable substitutes for Broilers, either at the wholesale or retail levels. For the same reasons, demand for Broilers is relatively inelastic, although prices for Broilers are responsive to changes in supply.

103.    The Broiler industry is highly concentrated. In 1995, there were 55 federally

inspected Broiler companies operating in the United States. There were 41 in 2010, and by 2014, only 34—only 20 or so of which have any meaningful presence. The Broiler industry's top-4-firms concentration ratio increased from 40.9% in 1997 to 57.9% in 2013. During the same time period, the top-8-firms' concentration ratio increased from 53.1% in 1997 to 79.3% in 2013.

104.    As a result of vertical integration, there is no spot or cash market for Broilers, and there has not been for decades. Thus, there is no alternative for Growers to care for Broilers outside the confines of an agreement with an Integrator.

105.    Broiler Grow-Out Services are fungible. Growers care for Broilers using Integrator's own birds, feed, and medicine. Growers bring to the table labor, investment capital, and land that are largely homogenous.

106.    The Broiler industry is replete with opportunities to collude.

107.    Affording the Cartel members opportunities to effectuate their anticompetitive Scheme against Growers, their officers regularly meet and communicate with one another through the National Chicken Council ("NCC"), a trade association whose officers represent a perpetual revolving door of high-ranking executives from Defendants and their Co-Conspirators.

108.    The NCC's membership includes representatives from Integrators responsible for some 95% of Broiler production. The NCC offers a "forum in which industry members can share ideas and work towards solutions to common problems." It is the "unified voice of the chicken industry" and has a committee dedicated to "Growout" operations.

109.    The NCC has three annual board meetings attended by Cartel members' senior executives, including a January meeting held along with the International Poultry Expo, a mid-year Board of Directors Meeting, and the NCC Annual meeting in October.

110.    For the 2010-11 NCC cycle, the executive committee included the following

26

individuals, serving one-year terms:

    a.    Lampkin Butts, **Sanderson Farms**, Laurel, MS;
    b.    Alan Duncan, Mountaire Corporation, Little Rock, AR;
    c.    Ron Foster, Foster Farms, Livingston, CA;
    d.    Ben Harrison, Jr., Amick Farms, LLC, Batesburg-Leesville, SC;
    e.    Michael Helgeson, Gold'n Plump Poultry, St. Cloud, MN;
    f.    Tom Hensley, Fieldale Farms, Baldwin, GA;
    g.    Mark Hickman, Peco Foods, Tuscaloosa, AL;
    h.    Donald Jackson, **Pilgrim's Pride Corporation**, Greeley, CO;
    i.    Mark Kaminsky, **Koch Foods**, Park Ridge, IL;
    j.    Bernard Leonard, **Tyson Foods**, Springdale, AR;
    k.    Bill Lovette, Case Foods, Troutman, NC; and
    l.    Elton Maddox, Wayne Farms LLC, Oakwood, GA.

111.    For the 2010-11 NCC cycle, the following individuals were appointed to the

board of directors serving three year terms:

    a.    John Comino, Southern Hens, Moselle, MS;
    b.    Paul Downes, Mountaire Corporation, Millsboro, DE;
    c.    Elise Durbin, Marshall Durbin Companies, Birmingham, AL;
    d.    Gary George, George's, Inc., Springdale, AR;
    e.    Trent Goins, OK Foods, Fort Smith, AR;
    f.    Donald Jackson, **Pilgrim's Pride Corporation**, Greeley, CO;
    g.    Donnie King, **Tyson Foods**, Springdale, AR;
    h.    Elton Maddox, Wayne Farms LLC, Oakwood, GA;
    i.    Pete Martin, Mar-Jac Poultry, Gainesville, GA;
    j.    James Perdue, **Perdue Farms**, Salisbury, MD;
    k.    Todd Simmons, Simmons Foods, Siloam Springs, AR; and
    l.    Robert Turley, Allen Family Foods, Seaford, DE.

112.    For the 2011-12 NCC cycle, the executive committee included the following

individuals, serving one-year terms:

    a.    Lampkin Butts, **Sanderson Farms**, Laurel, MS (Chairman);
    b.    Bill Lovette, **Pilgrim's Pride Corporation**, Greeley, CO (Vice Chair);
    c.    Michael Helgeson, GNP Company, St. Cloud, MN (Sec'y/Treasurer);
    d.    Alan Duncan, Mountaire Corporation, Little Rock, AR;
    e.    Ron Foster, Foster Farms, Livingston, CA;
    f.    Ben Harrison, Jr., Amick Farms, LLC, Batesburg-Leesville, SC;
    g.    Mark Hickman, Peco Foods; Tuscaloosa, AL;
    h.    Mark Kaminsky, **Koch Foods**, Park Ridge, IL;
    i.    Bernard Leonard, **Tyson Foods**, Springdale, AR;
    j.    Elton Maddox, Wayne Farms LLC, Oakwood, GA;
    k.    Jim Perdue, **Perdue Farms**, Salisbury, MD; and

27

l.      Don Taber, House of Raeford, Rose Hill, NC.

113.    For the 2011-12 NCC cycle, the following individuals were appointed to the

board of directors for three-year terms:

a.      William Andersen, Keystone Foods, Huntsville, AL;
b.      Robin Burruss, Tip Top Poultry, Marietta, GA;
c.      Joe DePippo, Hain Pure Protein Corporation, Brevard, NC;
d.      Carl George, George's, Inc., Springdale, AR;
e.      Robert Johnson, House of Raeford, Rose Hill, NC;
f.      Bernard Leonard, **Tyson Foods**, Springdale, AR;
g.      Mike Roberts, **Perdue Farms**, Salisbury, MD;
h.      Joe Sanderson, Jr., **Sanderson Farms**, Laurel, MS;
i.      Thomas Shelton, Case Foods, Eden, MD; and
j.      Jerry Wilson, **Pilgrim's Pride Corporation**, Greeley, CO.

114.    For the 2011-12 NCC cycle, NCC also elected Jason Penn, Executive Vice

President for Sales and Operations of Pilgrim's, and Sara Lilygren, Tyson's Senior Vice

President of External Relations, as "New Members."

115.    For the 2012-13 NCC cycle, NCC elected four officers to one-year terms:

a.      Mike Brown, Vienna, VA, as President;
b.      Bill Lovette, **Pilgrim's Pride Corporation**, Greeley, CO, as Chairman;
c.      Michael Helgeson, GNP Company, St. Cloud, MN, as Vice-Chair; and
d.      Jerry Lane, Pres., Claxton Poultry, Claxton, Georgia, as Secretary.

116.    For the 2014-15 NCC cycle, NCC selected four officers for one-year terms:

a.      Jerry Lane, President of Claxton Poultry in Claxton, Georgia, as Chairman;
b.      Todd Simmons, Chief Executive Officer of Simmons Foods, as Vice-Chair;
c.      Mike Popowycz, Vice Chairman and Chief Financial Officer at Case Foods, as
        Secretary-Treasurer; and
d.      Mike Brown, of Vienna, Virginia, was elected to another term as President of NCC.

117.    For the 2015-16 NCC cycle, NCC selected four officers for one-year terms:

a.      Todd Simmons, Chief Executive Officer of Simmons Foods in Siloam Springs,
        Arkansas, as Chairman;
b.      Mike Popowycz, Vice Chairman and Chief Financial Officer at Case Foods, as Vice-
        Chair;
c.      Ben Harrison, President and Chief Executive Officer of Amick Farms, LLC., as
        Secretary-Treasurer; and

d. Mike Brown, of Vienna, Virginia, was elected to another term as President of NCC.

118.    For the 2016-17 NCC cycle, NCC selected four officers for one-year terms:

a. Mike Popowycz, Vice Chairman and Chief Financial Officer of Case Foods (Troutman, North Carolina), as Chairman;
b. Ben Harrison, President and Chief Executive Officer of Amick Farms, LLC, as Vice-Chair;
c. Mark Kaminsky, Chief Operating Officer at ***Koch Foods***, as Secretary-Treasurer; and
d. Mike Brown, of Vienna, Virginia, was elected to a fifth term as President of NCC.

119.    In 2011, the NCC held meetings throughout the country, including its Annual Conference, attended by all executive committee officers and directors.

120.    In 2012, the NCC held meetings throughout the country, including a March board of directors meeting, a June board of directors meeting, an October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

121.    In 2013, the NCC held meetings throughout the country, including an October board of directors meeting and its Annual Conference in October, attended by all executive committee officers and directors.

122.    In 2014, the NCC held a January board of directors meeting, a March "Day in Washington" meeting attended by the executive committee, a June board of director meeting, an October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

123.    In 2015, the NCC held a January board of directors meeting, an April "Day in Washington" meeting attended by the executive committee, a June board of directors meeting, an October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

124.    In 2016, the NCC held a June board of directors meeting, and its Annual Conference in October.

125.    Agri Stats hosts regulator "poultry outlook conferences" for Integrators' executives, including an April 23, 2015 conference in Atlanta, Georgia.

126.    The Cartel members also have had the opportunity to collude through the U.S. Poultry & Egg Export Council ("USAPEEC"), which involves quarterly meetings with executives from both Defendants, the U.S. Poultry & Egg Association ("US Poultry"), of which both Defendants are members and which holds regular quarterly meetings, the Poultry Federation, which holds regular meetings involving executives from, *inter alia*, Pilgrim's and Tyson, and the International Poultry Council, of which Tyson, Sanderson, and Pilgrim's are individual members alongside the NCC, USAPEEC, and US Poultry as organizational members.

127.    The Cartel members also permitted one another to tour each other's Complexes, which revealed confidential business methods employed by a company. These tours afforded the Cartel the opportunity to conspire among senior executives.

128.    Finally, the Broiler industry has historically been the subject of antitrust scrutiny.

129.    During the 1970s, major Broiler producers held weekly conference calls to discuss production levels and prices for Broilers. After the Department of Justice and civil antitrust plaintiffs sued, that practice was stopped and settled for some $30 million, only to have Agri Stats later fill the void it left behind.

130.    Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the agriculture industry. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and a lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat

industry, but extreme political pressure from Defendants and their Co-Conspirators eventually watered down the rules and led to the resignation of the official charged with imposing tougher regulations.

131.    In 2011, the DOJ sued to stop George's Inc.'s acquisition of a Virginia processing plant owned by Tyson, later settling when George's made certain concessions.

132.    A June 2014 USDA report states, "the [Broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns, [including] the exercise of market power by Broiler integrators [which] have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal Agencies."

### Relevant Market and Monopsony Power

133.    The relevant market is the purchase of Broiler Grow-Out Services (the "Relevant Market"). The relevant geographic market is the United States.

134.    Here, a hypothetical firm or cartel that controlled a large share of the market for the purchase of Broiler Grow-Out Services, as the Cartel members collectively do here, could and did profitably suppress prices for Broiler Grow-Out Services below competitive levels through the alleged anticompetitive Scheme.

135.    There are no close economic and/or functional substitutes to Broiler Grow-Out Services. Integrators require the production of Broilers to supply their Complexes.

136.    Defendants and their Co-Conspirators purchase in excess of 98% of Broiler Grow-Out Services in the Relevant Market. A hypothetical firm or cartel that controlled a substantial share of the market for the purchase of Broiler Grow-Out Services could profitably impose a small but significant non-transitory decrease in compensation for Broiler Grow-Out Services. Due to the conduct challenged herein and other factors, Growers would not be able to

defeat such artificial price suppression by shifting the sale of their services to non-conspiring Integrators or other purchasers.

137.    The Relevant Market is also characterized by high barriers to exit. Because meeting Integrator specifications is generally financed through loans and repaid through compensation for Broiler Grow-Out Services, and the facilities have no utility other than producing Broilers, Growers are locked into selling Broiler Grow-Out Services until they gain the financial wherewithal to exit the market.

138.    Claiming to be bound by non-discrimination provisions of the PSA, Integrators, regardless of region of the country, (a) impose on Growers near uniform contracts (CFAs), and (b) set Grower base pay at identical or near identical levels. Because Integrators tend to pay the same base pay to their Growers regardless of geographic region, conduct that suppresses Grower compensation in one location, would necessarily suppress Grower compensation in all geographic regions in the United States.

139.    Absent the conduct challenged in this Complaint, Integrators would consider each other to be competitors for Broiler Grow Out Services whether Integrators happen to be in the same region or not, given that Integrators (a) could open plants in areas where another Integrator (or other Integrators) already exist, and (b) would compete with each other on a nation-wide basis for established Growers or to incentivize potential new Growers to move to areas where Integrators have established Complexes.

140.    Defendants and their Co-Conspirators collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation to Growers for Broiler Grow-Out Services below competitive levels.

### Anticompetitive Effects and Injury Suffered by Class Members

141.    As a result of the Cartel's Scheme challenged herein, Grower compensation has been suppressed below competitive levels.

142.    The anticompetitive agreement to suppress Grower compensation included both the no-poach agreement and an agreement to exchange, on a nationwide basis, contemporary sensitive information through Agri Stats regarding pricing, output, Grower compensation, and major costs. It has had significant anticompetitive effects with no countervailing procompetitive benefits.

143.    The information-sharing aspect of the Scheme disrupted the competitive process. Economic theory and antitrust jurisprudence show that such routine and granular information exchanges reduce the intensity of price competition and artificially suppresses compensation below competitive levels.

144.    In recent guidance to human resources professionals, the Department of Justice Antitrust Division ("DOJ") stated that "[s]haring information with competitors about terms and conditions of employment" can be anticompetitive in that it decreases competition below competitive levels by allowing firms to match each other's compensation rather than compete for services by offering additional compensation.

145.    Similarly, the "no poach" agreement aspect of the anticompetitive Scheme to suppress Grower compensation also had depressive compensation effects. By agreeing not to "poach" a would-be rival Integrator's Growers, competition for Broiler Grow-Out Services is suppressed. The "no poach" agreement contributes to the suppression of Grower compensation in three ways. First, the "no poach" agreement directly suppresses competition for Broiler Grow-Out Services in areas with more than one Integrator. More than 75% of Grower Class members

33

are situated in these geographic areas. Second, it discourages new Integrators from moving into areas with only a single Integrator. As a result of the "no poach" agreement, a new Integrator in a particular geographic area would have to incentivize new farmers to invest in becoming Growers, rather than poaching existing Growers. It is more costly for an Integrator to encourage new Growers to invest in Broiler Grow-Out Services for that Integrator than to convince existing Growers to switch Integrators. Third, because Integrators tend to pay the same base pay to their Growers regardless of geographic region, conduct that suppresses Grower compensation in one location, would suppress Grower compensation everywhere.

146.    The DOJ has also stated that "no poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws." This aspect of the anticompetitive Scheme here reduced competition for Grower services and thereby had a suppressive effect on Grower compensation.

147.    Seeking to comply with the Packers & Stockyards Act (PSA), Integrator Defendants (a) impose substantially similar CFAs on all of their Growers, and (b) make it a practice to compensate similarly situated Growers in like manner, with differences in compensation based on objective factors. Indeed, Integrators attempt to maintain a constant base pay across all of their Growers. Thus, any conduct that would serve to suppress compensation in one location, would tend to suppress compensation everywhere.

148.    In accord with economic theory and the above allegations, the Scheme here artificially reduced the compensation of all Growers below levels that would have prevailed in its absence.

149.    Moreover, under the law of supply and demand, because Grower compensation is suppressed, fewer Broilers are produced than if Growers were paid a competitive amount for

their services. As a result, fewer Broilers are processed and fewer are available for sale on the retail market. Thus, the Scheme serves as a means to collectively reduce Broiler output, which ultimately causes an artificial inflation of Broiler prices to final consumers. In addition to reducing output, the Scheme also constrains the types and methods of chicken growing, which reduces the options available to consumers. Accordingly, in addition to harm to the Growers, Defendants' Scheme harmed consumers as well, through artificially inflated prices and restricted choice.

150. One means by which the Scheme artificially reduced Grower compensation was through the compensation system each Integrator uses to pay its Growers, which Integrators euphemistically call the "Tournament System."

151. Each Integrator in a given location uses the so-called Tournament System to impose a rigid and formulaic compensation scheme under which Growers whose Broilers are slaughtered in a given week are compared. Under this system, Integrators determine Grower compensation based on how Growers rank against each other ("Settlement Group"). Integrators rank each Grower in a given region against each other, based on formulaic guidelines, and then pay Growers in compensation bands based upon the results.

152. Defendants and their Co-Conspirators each use the competitively sensitive information exchanged between them, as alleged herein, to set the base compensation and the compensation levels implemented through the Tournament System. Under the rigid rules of the Tournament System, the "top-performing" half of a Grower "cohort" receives base pay plus an incentive that is a function of base pay, and the bottom half of a cohort receives base pay less a disincentive of the same amount (with average compensation across a cohort equaling base pay).

153. Defendants and their Co-Conspirators rank their Growers in a given region against each other according to, *inter alia*, so-called feed conversion rates. Feed conversion rates are based on, among other things, the amount of feed used to attain weight gain. Defendants and their Co-Conspirators each pay Growers whose chicks had a better feed conversion rate the base amount multiplied by a bonus factor, and pay Growers whose chicks had a lower feed conversion rate the base amount multiplied by a diminution factor. This is not a "profit sharing" system. The total amount paid by the Integrators does not increase if total feed conversion rates increase.

154. Moreover, as a result of the illegal information exchange, as bolstered by the "no-poach" agreement, the Tournament System ensures that the anticompetitive effects caused by Defendants and their Co-Conspirators translate into reduced compensation for all Class members, including: (a) Growers receiving base pay times a bonus factor, (b) Growers receiving base pay, and (c) Growers receiving base pay times a diminution factor. In any given week, all Growers are being paid less than they would be paid in a competitive market without the illegal Scheme because each sub-group's compensation is pegged to the suppressed base pay amount. The anticompetitive conduct alleged herein thus artificially suppresses the pay levels under the Tournament System below levels that would have prevailed absent the anticompetitive Scheme alleged herein.

155. Since the 1980s, the inflation adjusted market price of Broilers has risen relatively steadily, while the Growers' share of that market price has fallen, with Integrators pocketing the difference. Since at least 2007, inflation-adjusted Grower pay has shown a significant, downward trend, while consumer prices have increased; this widened gap between farm gate prices and retail prices shows that neither the Grower nor consumer are better off under the Integrators' collective grip. Since 2008, there has been a nearly 50% increase in Broiler wholesale prices,

despite input costs (primarily corn and soybeans) falling roughly 20% to 23%. A quarter of Growers have negative net farm income, meaning they spend more money than they make from providing Broiler Grow-Out Services to Integrators. In 2006, average income was only $20,000 for medium Growers, accounting for 50% of Broiler production. In 2011, real Grower returns on investments were negative except for the largest of Growers, while 20% of small Growers failed to cover cash expenses, and nearly a third of small and a fifth of large Growers had negative net farm income. These limited or negative earnings come at the expense of investing hundreds of thousands if not over a million dollars on land, grow-out houses, and capital upgrades. As one commentator has observed, "contract producers who once had acceptable income from their poultry operations now put a few hundred thousand dollars of equity and borrow several hundred thousand more to hire themselves at minimum wage with no benefits and no real rate of return on their equity."

156.    An Oklahoma State University budget for Growers published in 2006 shows a loss of $4,260 annually on a $255,000 investment, while the Alabama Farm Business Analysis Association showed negative annual returns in 10 of the 15 years between 1999 and 2009, with average aggregate losses over that time period of $182,000. Some commentators have criticized the latter study as under-reflective of losses, as it reflects payouts 10% above actual average payouts.

157.    Class members similarly earn disproportionately low incomes when compared to their large debt burdens and workload, reporting net incomes between $12,000 and $40,000 a year despite generally working twelve-to-sixteen hours a day, seven days a week, fifty-two weeks a year.

## CLASS ACTION ALLEGATIONS

158.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) as representatives of a "Class"

defined as follows:

> All individuals and entities in the United States and its territories that were
> compensated for Broiler Grow-Out Services by a Defendant or Co-Conspirator, or
> by a division, subsidiary, predecessor, or affiliate of a Defendant or Co-Conspirator,
> at any time during the period of January 27, 2013 through and until the
> anticompetitive effects of Defendants' unlawful conduct cease.

159.    Subject to additional information obtained through further investigation and

discovery, the Class definition may be expanded or narrowed. The following persons and entities

are excluded from the proposed Class: federal government entities, Defendants, Co-Conspirators,

and any of their subsidiaries, predecessors, officers, or directors.

160.    The Class is so numerous that joinder of all members in this action is

impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed

Class contains thousands of similarly situated Growers.

161.    Plaintiffs' claims are typical of those of the Class.

162.    Plaintiffs and all members of the Class were injured by the same unlawful

conduct, which resulted in all of them receiving less in compensation for their Grow-Out

Services than they would have in a competitive market.

163.    Plaintiffs will fairly and adequately protect and represent the interests of the

Class. The interests of the Plaintiffs are not antagonistic to the Class.

164.    Questions of law and fact common to the members of the Class predominate over

questions, if any, that may affect only individual members because Defendants have acted and

refused to act on grounds generally applicable to the Class members.

165.    Questions of law and fact common to the Class include:

(1) Whether Defendants and their Co-Conspirators exchange of nonpublic, competitively sensitive information about Grower compensation constitutes (a) an agreement, combination, or conspiracy in restraint of trade in violation of the Sherman Antitrust Act, and/or (b) an unfair or deceptive practice in violation of the Packers and Stockyards Act;

(2) Whether Defendants and their Co-Conspirators' agreement not to "poach" each other's Growers constitutes (a) an agreement, combination, or conspiracy in restraint of trade in violation of the Sherman Antitrust Act, and/or (b) an unfair or deceptive practice in violation of the Packers and Stockyards Act;

(3) Whether Defendants and their Co-Conspirators' anticompetitive Scheme suppressed Grower compensation below competitive levels; and

(4) The proper measure of damages.

166.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust and unfair competition litigation.

167.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## COUNT ONE
**Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Antitrust Act**

168.    Plaintiffs incorporate each allegation above as if fully set forth herein.

169.    Defendants and their Co-Conspirators have engaged in an anticompetitive Scheme to suppress Grower compensation involving (a) contemporaneously and frequently

exchanging disaggregated data on Grower compensation, and (b) agreeing not to solicit or "poach" one another's Growers.

170.    The Scheme resulted in reducing compensation for all Growers below levels that would otherwise have prevailed.

171.    There are no procompetitive justifications for Defendants and their Co-Conspirators' conduct, or if there are, they are outweighed by the anticompetitive effects and, in any event, could be achieved through less restrictive means.

172.    This Scheme is a *per se* violation of the Sherman Antitrust Act.

## COUNT TWO
### Unfair Practices in Violation of Section 202 of the Packers and Stockyards Act

173.    Plaintiffs restate and re-allege the above paragraphs as if fully set forth in this cause of action.

174.    Defendants are "live poultry dealers" within the meaning of the Packers and Stockyards Act, as they obtain poultry in commerce, ship or sell poultry in commerce, and are "engaged in the business of obtaining live poultry by purchase or under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." 7 U.S.C. § 182(10).

175.    Plaintiffs seek damages for violation of the PSA, 7 U.S.C. § 192(a), which makes it unlawful for "any live poultry dealer with respect to live poultry, to . . . (e)ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device."

176.    Plaintiffs seek damages for violation of the PSA, 7 U.S.C. § 192(f)(3), which makes it unlawful for "any live poultry dealer with respect to live poultry, to . . . manipulate or control prices."

177.    Plaintiffs seek damages for violation of the PSA, 7 U.S.C. § 192(g), which makes it unlawful for "any live poultry dealer with respect to live poultry, to . . . [c]onspire, combine, agree or arrange with any person to do, or aid and abet the doing of, any act made unlawful by subdivision[] (a)…."

178.    As part of the anticompetitive Scheme alleged herein, Defendants and their Co-Conspirators have contemporaneously and frequently exchanged disaggregated non-public data on, *inter alia*, Grower compensation, with the intent and effect of suppressing compensation for Broiler Grow-Out Services for all members of the Class below levels that would otherwise have prevailed. Defendants and their Co-Conspirators have not shared or made available this data to Growers.

179.    There are no procompetitive justifications for Defendants and their Co-Conspirators' conduct, or if there are, they can be achieved through less restrictive means.

180.    Defendants and their Co-Conspirators used this information to suppress Grower compensation.

181.    These practices by Defendants adversely affected and injured competition in violation of the Packers and Stockyards Act.

## PETITION FOR RELIEF

Plaintiffs petition for the following relief:

A.    A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

B.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act and the Packers and Stockyards Act;

C.    A judgment and order requiring Defendants to pay damages to Plaintiffs and the members of the Class, trebled;

D.    An order enjoining Defendants from engaging in further unlawful conduct;

E.    An award of attorneys' fees and costs;

F.    An award of pre- and post-judgment interest on all amounts awarded; and

G.    Such other and further relief as the Court deems just and equitable.

## REQUEST FOR TRIAL BY JURY

Plaintiffs request a trial by jury of all issues so triable.

Dated: February 21, 2018

/s/ Larry S. McDevitt
Larry S. McDevitt, Bar No. 5032
David M. Wilkerson, Bar No. 35742
THE VAN WINKLE LAW FIRM
11 N. Market Street
Asheville, NC 28801
Tele: (828) 258-2991
Fax: (828) 257-2767
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com

*Additional Class Counsel for Plaintiffs and the Proposed Class*

Michael D. Hausfeld*
James J. Pizzirusso*
Melinda R. Coolidge*
Samantha S. Derksen*
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
Tele: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: mcoolidge@hausfeld.com
Email: sderksen@hausfeld.com

Gary I. Smith, Jr.*
HAUSFELD LLP
325 Chestnut St., Suite 325
Philadelphia, PA 19106
Tele: (215) 985-3270
Fax: (215) 985-3271
Email: gsmith@hausfeld.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Eric L. Cramer*
Patrick F. Madden*
Christina Black*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
Email: ecramer@bm.net
Email: pmadden@bm.net
Email: cblack@bm.net

Daniel J. Walker*
BERGER & MONTAGUE, P.C.
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
Email: dwalker@bm.net

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Vincent J. Esades*
HEINS MILLS & OLSON, PLC
310 Clifton Avenue
Minneapolis, MN 55403
Tele: (612) 338-4605
Fax: (612) 338-4692
Email: vesades@heinsmills.com

Warren T. Burns*
BURNS CHAREST LLP
500 North Akard, Suite 2810
Dallas, Texas 75201
Tele: (469) 904-4551
Email: wburns@burnscharest.com

Gregory Davis*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tele: (334) 832-9080
Fax: (334) 409-7001
Email: gldavis@knology.net

Charles D. Gabriel*
CHALMERS, BURCH & ADAMS, LLC
North Fulton Satellite Office
5755 North Point Parkway, Suite 251
Alpharetta, GA 30022
Tele: (678) 735.5903
Fax: (678) 735.5905
Email: cdgabriel@cpblawgroup.com

Harlan Hentges (OBA #17911)
HENTGES & ASSOCIATES, PLLC
102 Thatcher Street
Edmond, OK 73034
Tel: (405) 340-6554
Fax: (405) 340-6562

John C. Whitfield*
Caroline Taylor*
WHITFIELD BRYSON & MASON LLP
19 North Main Street
Madisonville, KY 42431
Tel: (270) 821-0656
john@wbmllp.com
caroline@wbmllp.com

Gary E. Mason*
Jennifer S. Goldstein*
WHITFIELD BRYSON & MASON LLP
5101 Wisconsin Ave., NW
Ste. 305
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 429-2294
gmason@wbmllp.com
jgoldstein@wbmllp.com

J. Dudley Butler*
BUTLER FARM & RANGE LAW GROUP, PLLC
499-A Breakwater Dr.
Benton, MS 39039
Tel.: (662) 673-0091
Fax: (662) 673-0091
jdb@farmandranchlaw.com

Daniel M. Cohen*
CUNEO GILBERT & LaDUCA, LLP
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Tel: (202)789-3960
Fax: (202)789-1813
Danielc@cuneolaw.com

David S. Muraskin*
PUBLIC JUSTICE, PC
1620 L St. NW, Suite 630
Washington, DC 20036
Tel: (202) 861-5245
Fax: (202) 232-7203
dmuraskin@publicjustice.net

M. David Riggs
Donald M Bingham
RIGGS ABNEY NEAL TURPEN ORBISON & LEWIS
502 W. Sixth St.
Tulsa, OK 74119
Tel: (918) 699-8914
Fax: (918) 587-9708
driggs@riggsabney.com
don_bingham@riggsabney.com

Hollis Salzman *
Kellie Lerner*
ROBINS KAPLAN LLP
99 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
KLerner@RobinsKaplan.com

Aaron Sheanin*
ROBINS KAPLAN LLP
2440 W. El Camino Real
Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
ASheanin@RobinsKaplan.com

M. Stephen Dampier*
LAW OFFICES OF M. STEPHEN DAMPIER, P.C.
55 N. Section St.
P.O. Box 161
Fairhope, AL 36532
Telephone: (251) 929-0900
Facsimile: (251) 929-0800
dampier.steve@gmail.com

*Additional Class Counsel for Plaintiffs and the Proposed Class*

* *Pro Hac Vice* to be filed